IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Carol A. Hines,                                        :

         Plaintiff                              :        Civil Action 2:10-cv-520

   v.                                                 :        Judge Watson

Commissioner of Social Security,              :        Magistrate Judge Abel

         Defendant                            :

## REPORT AND RECOMMENDATION

Plaintiff Carol A. Hines brings this action under 42 U.S.C. §423 for review of a final decision of the Commissioner of Social Security denying her application for disability insurance benefits.  This case is now before the Magistrate Judge for a report and recommendation on the disposition of this matter.

**Summary of Issues**.  Plaintiff Hines filed an application for a period of disability and disability insurance benefits on November 21, 2005, alleging that she became disabled on July 29, 2004, at age 42, by seizures and diabetes.  The administrative law judge found that Hines retains the ability to perform light work restricted to simple, unskilled, low-stress tasks.  Plaintiff argues that the decision of the Commissioner denying benefits should be reversed because the ALJ's determination as to her credibility and contribution to her own condition was not supported by the record, the ALJ's finding that her diabetes was stable was not supported by the record, and the ALJ failed to give weight to four treating sources.

1

**Procedural History**.  Plaintiff Carol A. Hines filed her application for a period of disability and disability insurance benefits on November 21, 2005, alleging that she became disabled on July 29, 2004 by seizures and diabetes.  (R. 63.)  The application was denied initially and upon reconsideration.  Plaintiff sought a *de novo* hearing before an administrative law judge.  On April 23, 2009, an administrative law judge held a hearing at which Plaintiff, represented by counsel, appeared and testified.  (R. 803.)  A vocational expert testified at the hearing.  On June 19, 2009, the administrative law judge issued a decision finding that Hines was not disabled within the meaning of the Act.  (R. 12-24.)  On April 12, 2010, the Appeals Council denied Plaintiff's request for review and adopted the administrative law judge's decision as the final decision of the Commissioner of Social Security.  (R. 4.)

**Age, Education, and Work Experience**.  Plaintiff was born on March 17, 1962.  (R. 54.)  She attended high school through the twelfth grade, and graduated in 1980.  (R. 68.)  From March 1998 to July 2005, she worked as an inspector and press operator in an industrial facility, and held this job at the time she alleged she became unable to work.  (R. 64.)  Hines testified that she stopped working because she suffered repeated blackouts at work, which required her employer to take her to the hospital and which led her to make inspection errors.  (R. 807.)

**Plaintiff's Testimony**.  The administrative law judge summarized Hines' testimony at the hearing as follows:

> At the hearing, the claimant testified that she was sixty-one inches in height and weighed 204 pounds.  She graduated from high school; she did not report any problems with literacy.  She had a driver's license and

2

drove for short distances.  Her husband brought her to the hearing.

She last worked in July 2004.  She stated that she was no longer able to work due to heart disease, diabetes mellitus, low back pain, seizure disorder, and sleep apnea.  She experienced chest pain secondary to the heart disease; she use [sic] nitroglycerin for the pain.  Her diabetes had been uncontrolled since 2004.  She used insulin in addition to oral diabetes medications.  The pain in her low back radiated down her right leg.  She had problems sitting and standing for prolonged periods of time.  She had suffered only two seizures in 2008.  The claimant reported that she used a CPAP machine to treat her sleep apnea.

The claimant reported that she experienced eight to ten episodes of chest pain on a daily basis.  She experienced constant back pain.  She took Vicodin for the back pain, which helped.  She became fatigued easily and napped during the day.

In addition to her physical problems, she was afflicted with anxiety and depression.  She experienced memory problems as a result of her mental impairments.  She was treated with Celexa and Xanax.  She did not sleep well; she took medication to help her sleep.

When asked about her physical abilities, the claimant related that she could lift twelve pounds.  She could walk for 120 feet.  She could stand or sit for thirty minutes without interruption.  She was able to climb a few stairs.

The claimant reported that she lived in a mobile home with her husband and her adult son.  She did her own household chores, such as cooking, cleaning, and laundry.  Her husband helped her with the grocery shopping.  She socialized only with family members.  She smoked a half-pack per day.

(R. 14-15.)

## Medical Evidence of Record.

Although the administrative law judge's decision fairly sets forth the relevant medical evidence of record, this Report and Recommendation will summarize that evidence in some detail.

**Physical Impairments**.

Treatment from Angela Rutan for diabetes.  Plaintiff's record concerning her diabetes is lengthy.  Her treatment was chiefly provided by Angela Rutan, a nurse practitioner whom she saw frequently between July 2004 and October 2008.

On August 23, 2004, Plaintiff saw Rutan for a follow-up evaluation of her diabetes.  Plaintiff reported that her diabetes was worsening, and that her blood sugar level had been good until stress the previous week had sent it sharply higher. (R. 338.)  On September 7, 2005, Plaintiff visited her clinic complaining of right ear and leg pain.  The medical notes indicated that Plaintiff's type-2 diabetes had "worsened" and was "[u]ncontrolled at the present time."[1]  (R. 315-16.)  Rutan prescribed an increased dose of Humalog insulin.  At a September 26, 2005 follow-up, Rutan noted that Plaintiff's diabetes "remains stable".  (R. 311.)  At a January 26, 2006 visit, she stated that "[t]he diabetes has improved.  The patient denies polyuria, polyphagia, polydipsia, change in vision, foot ulcerations, or hypoglycemic episodes." (R. 303.)  On February 7, 2006, Plaintiff reported that her diabetes "remains stable", though it had "been high the last two weeks".  (R. 301.)  Rutan confirmed at an April 24, 2006 follow-up that Plaintiff's diabetes "remains stable." (R. 295.)

On February 6, 2007, Plaintiff returned to Rutan for a follow-up.  She stated that she had stopped taking her insulin in early December, because she had suffer-

---

[1]  Plaintiff apparently saw Dr. Winifred E. Stoltzfus, M.D. on this occasion. (R. 315.)

4

ed a nervous breakdown and "gave up on taking care of self". (R. 278.) Rutan noted that the "diabetes has worsened, the blood glucoses have not been satisfactory." Plaintiff reported "feeling terrible." The same day, Rutan sent a letter to Plaintiff's insurance company concerning an application for disability benefits. (R. 280.) Rutan opined that Plaintiff had "generalized anxiety disorder", "left temporal lobe disorder", "poorly controlled diabetes", and several other disorders. She concluded that "[i]t is poor judgment to consider this lady has any ability to work as a result of both her physical and mental health condition."

On February 20, 2007, however, Plaintiff reported at another visit to Rutan that she was "doing much better" and was back on her medication. (R. 276.)

On April 10, 2007, Ms. Rutan completed a form physical capacity evaluation. She opined that Plaintiff could sit no more than two hours and stand no more than one hour in a workday, and that she would need the opportunity to alternate sitting and standing. (R. 270.) Plaintiff could push or pull, but could not perform fine manual manipulation or engage in repetitive hand or foot movements. Rutan opined that Plaintiff could occasionally lift or carry up to five pounds, and could occasionally stoop or reach above shoulder level, but that she could never climb, balance, kneel, crouch, or crawl. (R. 271.) Plaintiff was totally unable to be around unprotected heights, moving machinery, or marked changes in temperature or humidity, and had severe restrictions on her ability to drive automobiles or be exposed to dust, fumes, or gases. Rutan further opined that Plaintiff suffered from fatigue and pain. (R. 272.) Her pain was not completely disabling, though it

5

moderately affected her ability to concentrate. (R. 273.)

On June 26, 2007, Rutan noted that Plaintiff's diabetes "remains stable" (R. 261), and was "improved" on August 2, 2007 and January 24, 2008. (R. 259, 532.) She again recorded it as "stable" on April 8, 2008 (R. 525). Plaintiff reported on May 19, 2008, however, that her diabetes had "worsened" and that blood glucoses had not been satisfactory. (R. 522.) At an October 13, 2008 visit, Plaintiff reported that her diabetes had improved, and that she was off "insulin again due to med compliance" (R. 609). At an October 24, 2008 visit, Rutan noted that Plaintiff's diabetes "remains stable" (R. 602).

Other evidence concerning diabetes and seizures. On October 21, 2004, Plaintiff saw Dr. Dana P. Schuster, M.D., an endocrinologist, for "ongoing issues of diabetes management", upon referral from Ms. Rutan. (R. 124.) Dr. Schuster reported that Plaintiff had told her she had been diagnosed with type-2 diabetes in June 2003. However, her blood sugar levels had been significantly elevated despite major adjustments in her medication. Dr. Schuster noted that Plaintiff had poor nutritional habits with stress eating and no regular exercise, and that she smoked between a half and one pack of cigarettes per day. Plaintiff reported her average morning blood sugar of 260-460, with an average at noon of 160-200 and a dinner reading of 200. Dr. Schuster opined that Plaintiff should switch from Insulin R to Humalog and should learn to count carbohydrates and adjust her insulin accordingly. She also recommended Tricor for lowering cholesterol. (R. 125.)

On September 4, 2005, Plaintiff presented at the emergency room as a result

of having accidentally taken Humalog insulin instead of Lantus. (R. 151.) She reported to the admitting nurses that her blood sugar was typically between 200-400, but that it had been as high as 498 the previous weekend after increased stress. It was at 298 at the time of her medication error. A blood sugar test in the emergency department showed her level to be 334, and she was held in the emergency department for two hours for observation. (R. 152.) The emergency room physician concluded that Plaintiff had tolerated the insulin misadministration well but that she should continue to monitor her blood sugar closely at home. (R. 153.)

On September 26, 2005, Plaintiff underwent an exercise stress test, which had a normal result. (R. 478.) On the same day, she underwent an EEG, which showed no abnormal findings during sleep. However, the administering physician noted that the EEG showed a focus of slow and sharp activity in the left and right temporal region, suggesting the presence of an irritative and epileptogenic lesion. (R. 480.)

On November 25, 2005, Plaintiff went to the emergency room, complaining of lower-leg swelling. (R. 137.) A normal venous duplex exam of the right leg showed no evidence of deep or superficial venous thrombosis, and no valvular incompetence. Her left leg appeared normal. (R. 141.)

Plaintiff underwent another EEG, on November 8, 2006, which showed no abnormal findings during sleep. However, the administering physician again noted that the EEG showed a focus of slow and sharp activity in the left temporal region,

suggesting the presence of an irritative and epileptogenic lesion in that area. (R. 461.)

In June 2008, Plaintiff experienced a seizure, during which she lost consciousness. (R. 548-551.) At the emergency room, she reported that her last seizure with blackout had been several years prior, and that she had stopped taking her seizure medications about a year and a half earlier because she didn't believe that she needed them anymore. Plaintiff also reported having quit smoking for approximately a year and then having started again about two weeks prior. (R. 548.) She received chest x-rays and EKG, with normal results, although her glucose was measured as high. She was discharged later that day. (R. 552-553.)

Plaintiff visited Mad River Internal Medicine on several occasions for follow-ups and review of her medications. On December 31, 2007, her consultant, Cynthia Parziale, CNP, noted that Plaintiff reported that her blood sugar had been under control so long as she did not take nitroglycerin. (R. 535.) On June 23, 2008, Plaintiff reported to Parziale that her "sugars have been about the same", but that her level had been over 300 the day before. (R. 517.)

On January 14, 2009, blood testing was performed for Plaintiff at Mary Rutan Hospital in Bellefontaine. Her blood sugar level was 88. (R. 648.)

Plaintiff began seeing a new family physician, Dr. Thomas E. Darrah, sometime in 2008. (R. 810.) He noted on December 22, 2008 that Plaintiff was insulin-dependent for diabetes mellitus type 2, and that she had reported that her blood sugar had recently run in the 160s. (R. 659.) At February 9, 2009 visit, he

reported that Plaintiff's fasting blood sugar was 207. (R. 654.)

Treatment from Angela Rutan for apnea. On August 27, 2007, Rutan noted that Plaintiff reported not using her CPAP machine, and stated that she would "call sleep clinic to get the mask she needs to resume this". (R. 257.) At visits on April 8, 2008 and May 19, 2008 (R. 525, 522), Rutan made identical notes that Plaintiff was not using her machine because she was not able to tolerate its use, and that Plaintiff's sleep apnea had worsened: "[T]hought was to stop this; urged to start this now". On July 24, 2008, Rutan made another identical note, but added that she had recommended Plaintiff resume use of her CPAP due to her recent increase in weight, and "will get her a new mask". (R. 513.)

Treatment from Daniel Jones, M.D. Plaintiff was treated by Dr. Jones, a neurologist, from approximately August 2004 until September 2008. On November 1, 2004, Plaintiff visited him concerning hypoglycemic episodes. (R. 223.) Dr. Jones noted that her blood sugars had "fluctuated markedly", and that her spells were most likely related to this. "We have not completely ruled out seizure, but it is highly unlikely." Dr. Jones noted that Plaintiff reported having been diagnosed with obstructive sleep apnea, but that "[s]he has not found the time to use her CPAP machine, as yet." He strongly encouraged use of the machine, opining that it might improve her blood sugars. (R. 224.)

After a later January 29, 2007 appointment, Dr. Jones opined:

Because of the fact that the patient cannot drive due to seizures, cannot work in stressful environments due to generalized anxiety disorder, and intermittent explosive behavior, we are fairly limited in

9

> what we can do.  For some reason, her disability was turned down.  I
> am recommending an appeal of this.  She will obtain her documents
> from psychiatry and perhaps the SSI board review all things
> considered will change their previous determination.

(R. 190.)

On September 11, 2008, Plaintiff saw Dr. Jones for a follow-up after having suffered another seizure and been taken to the hospital.  (R. 703.)  She reported stroke-like symptoms; Dr. Jones diagnosed complex partial seizure disorder with secondary generalization and continued her seizure and anxiety medications.

On April 9, 2009, Dr. Jones completed a form medical source statement concerning Plaintiff's residual functional capacity.  (R. 775-82.)  He opined that she could sit for three hours at a time, or six hours total, in a workday, and that she would need to elevate her right leg to waist level while sitting.  Dr. Jones found that she could stand or walk about for no more than twenty minutes at a time, or three hours total, and that Plaintiff would need to rest for some period of time in addition to regular breaks due to pain, fatigue, and shortness of breath.  (R. 776-77.)  She could occasionally lift up to ten pounds, and could occasionally balance, stoop, move her neck, and reach with her arms.  (R. 779.)  Plaintiff could frequently handle or manipulate objects with her hands and frequently make repetitive foot movements, but could not climb.  (R. 780.)  Dr. Jones also opined that Plaintiff could operate a vehicle if her blood sugar were below 200.  (R. 781.)

Other evidence concerning apnea.  On June 4, 2008, Plaintiff underwent a polysomnography at Wilson Memorial Hospital, after complaining of excessive

10

daytime sleepiness and being diagnosed with obstructive sleep apnea. (R. 508-09.) At the time, she reported that she had quit using her CPAP machine in 2007 after sustaining a heart attack. (R. 508.) The attending physician's impressions were that Plaintiff suffered mild obstructive sleep apnea, periodic leg movement disorder, decreased REM sleep, and absent slow-wave sleep. (R. 509.)

On October 10, 2008, Plaintiff underwent another sleep study, at the Sleep Center of Lima. (R. 711-714.) This reported similar results to the June 4, 2008 study. (R. 713.) The attending physician reported that Plaintiff said she had quit using her CPAP machine three years before due to broken supplies and wire, and that she smoked one pack of cigarettes per day. (R. 711-712.) Plaintiff was advised to return after six weeks of CPAP therapy for clinical re-evaluation, and advised to quit smoking as soon as possible. (R. 713.)

Myocardial infarction. On July 23, 2007, Hines had chest pain and had positive cardiac enzymes. She was transferred to the Ohio State University Medical Center, where she immediately underwent cardiac catheterization. A critical circumflex lesion was found and stented. The diagnoses included myocardial infarction, coronary artery disease, hypertension, hyperlipidemia, and diabetes mellitus Type II. (R. 235.) Another stent in the circumflex was installed in November 2007. A January 2008 coronary7 angiogram revealed no changes from a November 2007 angiogram. The circumflex stent was patent. A CAT-scan showed no evidence of an aneurysm. In January 2008, Hines was clinically stable. (R. 498.)

State agency physician. On May 10, 2006, Dr. Myung Cho, a state agency

physician, completed a physical residual functional capacity assessment of Plaintiff based upon her record.  (R. 175-182.)  Dr. Cho opined that Plaintiff could occasionally lift or carry fifty pounds, could frequently lift or carry twenty-five pounds, could stand, walk, or sit about six hours in a workday, and had unlimited ability to push or pull.  (R. 176.)  Plaintiff could never climb ladders, rope, or scaffolds, and could not be exposed to extreme heat or cold, humidity, fumes, or workplace hazards.  (R. 179.)  Dr. Cho specifically rejected Dr. Jones' note to Prudential Life detailing her capacity, stating that it was unaccompanied by any medical findings.  (R. 176.)  She further opined that Plaintiff's description of her seizures exceeded in frequency and severity her reports to her treating sources.  (R. 177.)

**Mental Impairments**.

Dr. Daniel D. Hrinko.  On March 8, 2006, Dr. Hrinko evaluated Plaintiff at the request of a state disability determination agency.  (R. 154-57.)  Plaintiff told him that she suffered from seizures two to three times per week, and that her doctor had told her that stress, anxiety, and worry exacerbated them.  She stated that she was very frustrated at the fact that she could no longer work, but that her seizures had made it impossible for her to continue to work safely at her factory. (R. 155.)  Plaintiff reported being tired most of the day, and that seizures made it difficult for her to complete chores or other activities of daily living.  Dr. Hrinko noted that Plaintiff suffered from occasional problems of short-term memory and concentration.

12

Dr. Hrinko concluded that Plaintiff's ability to relate with coworkers and supervisors was mildly impaired, but that her ability to understand and follow instructions was markedly impaired.  He found that the frequency with which she had to be reminded of the topic of discussion "was alarming".  (R. 156.)  Dr. Hrinko found that her ability to maintain attention to perform simple and repetitive tasks and her ability to withstand the stresses and pressures of employment were moderately impaired.

Dr. Marianne Collins.  On March 27, 2006, Dr. Collins, a state agency psychologist, reviewed Plaintiff's record.  She opined that Plaintiff was moderately limited in her ability to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods, to sustain an ordinary routine without special supervision, and to copmlete a normal workweek without interruptions from psychologically based symptoms. (R. 157-58.)  Dr. Collins found Plaintiff "credible" and gave weight to Dr. Hrinko's examination, but opined that she "remains capable of carrying out simple tasks in situations where a supervisor or coworker is present to explain tasks and give directions and occasionally redirect."  (R. 159.)

Dr. Anthony M. Alfano.  On October 17, 2006, Dr. Alfano evaluated Plaintiff at the request of a state diability determination agency.  (R. 183-187.)  He stated that Plaintiff was cooperative and had a good manner, with no eccentricity, impuls-ivity, or compulsivity noted.  Plaintiff informed him that she had lost some weight due to her diabetes, and that she had sleep disturbances and used a CPAP machine.

13

She denied any crying spells or suicidal/homicidal ideation, but admitted to feelings of hopelessness due to an inability to get her diabetes under control. (R. 184.) Dr. Alfano noted no outward manifestations of anxiety or feelings of apprehension or doom, although Plaintiff reported occasional anxiety attacks. During his interview with Plaintiff, Dr. Alfano observed no signs of disorientation, confusion, or lack of awareness. (R. 185.) He administered the WAIS-III intelligence test, which yielded scores at the "extreme high end of the borderline range of intellectual functioning"; Dr. Alfano opined that "the borderline intellectual functioning range is probably a low estimate of her IQ, in that she is almost at the low average range of mental ability." (R. 186.) He also administered the Weschler Memory Scale-III, finding all of Plaintiff's memory index scores within two standard deviations below the mean, with a high working memory score. (R. 186.) Dr. Alfano concluded:

> In summary, she has the mental ability to manage her own funds. She is probably only mildly impaired in this area due to the anxiety disorder. She certainly has the mental ability to relate to others including fellow workers and supervisors. I feel that she is not impaired in this area. She has the mental ability to understand, remember, and follow instructions and is probably not impaired in this area. She has the mental ability to maintain attention, concentration, persistence, and pace to perform simple repetitive tasks. She is probably only mildly impaired in this area due to the anxiety disorder. Finally, she has the mental ability to withstand the stress and pressures associated with day-to-day work activity. She is only mildly impaired in this area because of the anxiety disorder.

(R. 187.)

<u>Angela Rutan</u>. On April 10, 2007, Ms. Rutan completed a form mental residual functional capacity assessment. She opined that Plaintiff was markedly

limited in her abilities to remember locations and procedures, understand, remember, and carry out detailed instructions, maintain attention and concentration, perform activities within a schedule, sustain an ordinary routine without supervision, complete a normal workday or -week without interruption from psychological symptoms, accept instructions and criticism from superiors, and respond appropriately to changes in the work setting.  Plaintiff was moderately limited in her ability to understand, remember, and carry out short instructions, make simple work-related decisions, interact appropriately with the general public, ask simple questions, maintain socially appropriate behavior and appearance, and to be aware of normal workplace hazards.  (R. 274-75.)

**Administrative Law Judge's Findings**.  The administrative law judge found that Hines had the severe impairments of coronary artery disease, diabetes mellitus, obesity, chronic obstructive pulmonary disease, seizure disorder, depression, and anxiety.  (R. 15.)  She concluded that Hines' physical and mental impairments limited her to a reduced range of light work.  (R. 18.)  The ALJ determined specifically that Hines was restricted by her residual functional capacity to simple, unskilled, low stress tasks, not involving exposure to heights or hazards.  Hines could furthermore not perform work involving assembly line quotas, balancing, or driving. (R. 18.)

The vocational expert testified that, given the limitations established in the residual functional capacity given by the ALJ, Hines could perform at least 45,000 unskilled jobs in the national economy at the light level of exertion, and at least

3,500 unskilled jobs in the regional economy.  (R. 23.)  Accepting that testimony, the administrative law judge determined that Plaintiff Carol Hines was not disabled. (R. 23.)

**Standard of Review**.  Under the provisions of 42 U.S.C. §405(g), "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive."  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Company v. NLRB*, 305 U.S. 197, 229 (1938)).  It means "'more than a scintilla.'" *LeMaster v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole.  *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Houston v. Secretary*, 736 F.2d 365, 366 (6th Cir. 1984); *Fraley v. Secretary*, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "take into account whatever in the record fairly detracts from its weight." *Beavers v. Secretary of Health, Education and Welfare*, 577 F.2d 383, 387 (6th Cir. 1978) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1950)); *Wages v. Secretary of Health and Human Services*, 755 F.2d 495, 497 (6th Cir. 1985).

**Plaintiff's Arguments**.  Plaintiff argues that (1) the ALJ's determination as to her credibility, including suggestions that she was in part responsible for her own condition, was not supported by the record; (2) the ALJ's finding that her diabetes was "stable" was not supported by the record; and (3) the ALJ failed to give any

16

weight to the findings and opinions of Dr. Hrinko, Dr. Jones, or Nurse Rutan.

> <u>Analysis</u>.

> <u>Characterization of testimony and lifestyle</u>.  Plaintiff argues in the first place that the ALJ mischaracterized her as being able to carry on a normal home life, which was not in accordance with her testimony at the hearing.  The ALJ found in her opinion that Plaintiff "was able to do her own household chores, such as cooking, cleaning, and laundry", and "did the shopping with her husband."  (R. 21.) Instead, Plaintiff asserts in her Statement of Errors:

>> Even though the Claimant indicated that she could engage in routine home activities, the Claimant, on several different occasions, specif- ically indicated that she could not stand for more than 10-20 minutes, could not cook an entire meal, could not handle even minor stress and could not perform certain functions at all, based on her current limit- ations.

(Doc. 12 at 2-3.)  Even without taking into account the question of a credibility determination, the ALJ accurately characterized Plaintiff's testimony.  Plaintiff testified at the hearing that she was able to do her housework "[f]or the most part", that she cooked breakfast and lunch, that she could do laundry, and that she went shopping either by herself or with her husband's assistance.  (R. 820, 828.)  As the Commissioner points out, Plaintiff did not actually argue that the ALJ's credibility determination was flawed in some way, but rather that she "would disagree with the ALJ".  The Court can find no basis upon which to overturn the decision of the ALJ in this respect.

> Plaintiff also takes exception with what she characterizes as "criticism" of or

an "attack" upon "her lifestyle choices"; she states that the ALJ exaggerated her

obesity, smoking, and failure to use her CPAP machine.  In her opinion, the ALJ

stated:

> The record is rife with noncompliance on the part of the claimant.  A
> treating neurological source noted that the claimant had been diag-
> nosed with obstructive sleep apnea, for which a CPAP machine had
> been prescribed.  However, the claimant reported that she had not
> found the time to use it.  When a repeat sleep study was performed in
> June 2008, the claimant reported that she had not used her CPAP
> machine since 2007.  The current study showed only "mild" apnea.  She
> required emergency room treatment in June 2008, after suffering a
> seizure at home.  The claimant's husband advised the medical staff
> that the claimant had taken herself off her anti-convulsant medication
> eighteen months earlier.  Despite suffering from both coronary and
> respiratory problems, the claimant continues to smoke against medical
> advice.

(R. 21, citations omitted.)  It is not clear what error Plaintiff raises with respect to

the ALJ's characterization; she seems essentially to take exception to the ALJ's

tone.  Although the ALJ did not mention Plaintiff's testimony at the hearing that

she still used her CPAP (R. 812), the record is, as the ALJ correctly stated, rife with

notes from various medical providers that Plaintiff reported not using her CPAP for

extended periods of time.  Plaintiff also does not state the significance of this

supposed mischaracterization; she does not argue that the ALJ should have, and

failed to, list obstructive sleep apnea amongst her severe impairments.  Similarly,

although Plaintiff argues that she has attempted to lose weight and curb her smok-

ing, she has not provided any support for a contention that the ALJ's statements

that obesity and continued smoking contributed to her medical problems was not

based upon substantial evidence.  There is therefore no basis to overturn the ALJ's

18

decision in this respect.

Medical sources.  Plaintiff argues in addition that the ALJ erred in failing to give any weight to the findings of Dr. Hrinko, Dr. Alfano, Dr. Jones, and Nurse Rutan.  As noted above, Dr. Hrinko conducted a March 2006 consultative psychological evaluation, finding various levels of impairment, including a "marked" impairment in ability to understand and follow instructions.  Dr. Alfano conducted an October 2006 consultative examination, finding that Plaintiff's IQ scores indicated borderline intellectual functioning, but appeared to be an underestimate of her actual cognitive abilities.  Plaintiff asserts that the ALJ erred in assigning little weight to Dr. Hrinko's finding of marked impairment, due to a lack of clinical findings to support this determination and its inconsistency with his assessment of a GAF score of 65.  She also asserts that the ALJ erred in ignoring Dr. Alfano's finding of borderline intellectual functioning.

Again, however, Plaintiff's apparent argument is that the ALJ was biased against her and insisted upon using "only the findings which fit into the Administrative Law Judge's apparent preconceived conclusions".  (Doc. 12 at 5.)  Under 20 C.F.R. §404.1527(f)(2), an ALJ will evaluate the findings of a State agency psychological consultant based upon such factors as the supporting evidence in the case record and supporting explanations by the consultant, and must give an explanation for the weight to which she gives such findings.  Here, despite Dr. Hrinko's observation that Plaintiff had to be reminded of the topic of conversation an "alarming" number of times, Dr. Alfano administered formal memory testing, with results

19

within two standard deviations below the mean.  The ALJ thus had substantial evidence upon which to discount Dr. Hrinko's conclusion of "marked" memory problems as not supported by clinical findings and inconsistent with other evidence. In addition, Dr. Alfano expressed reservations as to his own finding of borderline intellectual functioning, finding that it was "probably a low estimate" and that Plaintiff was "almost at the low average range of mental ability." (R. 186.) Furthermore, the ALJ determined that Plaintiff had the residual functional capacity to perform light work, limited to simple, unskilled, low stress tasks. Plaintiff has not offered any argument as to how different weight given to the opinions of Drs. Hrinko and Alfano might have affected this limited vocational range.

The ALJ rejected Rutan's opinion that Plaintiff was both physically and mentally disabled from work activity as an issue reserved to the Commissioner of Social Security.  20 C.F.R. §404.1527(e).  She also found that Rutan's conclusions were not supported by the weight of the evidence.  In addition, the ALJ noted that a nurse practitioner is not an acceptable medical source under 20 C.F.R. §404.1513(a). Plaintiff argues that the ALJ "basically totally ignores the opinion of the Nurse Practitioner", and that Rutan's opinions "provide insight into the Claimant's long-standing problems and contribute in a positive way to support the opinions of" Dr. Jones.  She concedes that Rutan "is not a traditional treating source and her opinion is not entitled to controlling weight".  However, controlling weight aside, Rutan is not an "acceptable medical source" under Social Security regulations, and

20

cannot provide evidence to establish whether Plaintiff has a medically determinable impairment.  20 C.F.R. §404.1513.  The ALJ therefore did not err in affording little weight to Rutan's physical and mental health opinions.

Finally, the ALJ addressed Dr. Jones in her opinion:

> In April 2009, Dr. Jones, a former treating neurologist, reported that the claimant would be limited to sedentary work.  However, he provided no objective support for his conclusions and the record is devoid of any evidence of treatment by him after 2007.  His opinion is not well supported by the medical record, which shows that the claimant's seizures decreased dramatically when she was compliant with medication, therefore, it is entitled to little weight in this matter.

(R. 20.)  Plaintiff states that Dr. Jones was her longtime treating physician, and was entitled to deference.  She is correct that the ALJ's statement that the record shows no evidence of treatment by Jones after 2007 is factually inaccurate, as she saw Jones on September 11, 2008 to follow up on an emergency room visit after a seizure.[2]  However, she argues:

> For the Administrative Law Judge to allege that the findings and opinions by Dr. Jones were to be given "little weight" based upon the treatment provided by Dr. Jones for the past several years is totally and completely without justification.  Dr. Jones had been one of the Claimant's primary treating physicians from late 2004 through June, 2007 (over 12 visits).  Dr. Jones also treated the Claimant in September, 2008 as set forth above.  His opinions contained in his analysis are one of the primary supporting reasons for the Claimant's total disability.  The fact this doctor's opinion is not given controlling weight is justification in and of itself to reverse the decision of the Administrative Law Judge.  Why would the Administrative Law Judge simply dismiss this opinion based upon a long-standing relationship. [.

_____

[2]  Plaintiff makes much of the ALJ's reference to Dr. Jones as a "former" treating physician, and suggests that "that finding apparently colored her entire opinion."  (Doc. 19 at 1.)

. .] This history entitles Dr. Jones to provide an opinion that should be given deference and controlling weight.  To dismiss his opinions in such a routine way in one paragraph of the ALJ decision is a significant basis for reversal.  Further by ignoring the records and treatment history treats the Claimant's history and consultations with Dr. Jones as meaningless, when they were certainly not meaningless.

(Doc. 12 at 7-8.)  Bluster is not a substitute for an argument founded upon the law and regulations.  The ALJ tersely discounted Jones' April 2009 form medical source statement as not objectively supported by his treatment records.  20 C.F.R. §1527 provides that treating sources are not "entitled" to deference and controlling weight:

If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

The ALJ evaluated the record and concluded that Jones had failed to provide objective support for his conclusions that Plaintiff was limited to sedentary work. She further noted that Plaintiff's medical records supported instead a conclusion that her seizures were controlled by medication.  The burden is upon Plaintiff to refute this finding, by indicating evidence in the record, from Jones' treatment records or elsewhere, to support such findings as an ability to stand or walk for only twenty minutes.   Plaintiff has not made any showing that the ALJ's determination was not based upon substantial evidence, and the Court accordingly cannot find error in it.

Plaintiff's diabetes.  In her opinion, the ALJ stated:

The claimant's testimony that her diabetes mellitus has been uncontrolled since 2004 simply is not supported by the record.  To the con-

22

trary, treatment notes consistently described her diabetes as "stable".

(R. 21, citations omitted.)[3]  Plaintiff argues that the ALJ selectively cited from the record in making this determination:

> To the contrary, the medical records are mixed in nature.  Some records certainly show that her diabetes is under control and other records clearly show that the diabetes is not under control.  The records are actually not even close to being consistent in that regard.  To make a finding that the Claimant's diabetes was under control is not a valid finding whatsoever!

(Doc. 12 at 4.)[4]  Plaintiff point to any evidence that Hines's diabetes imposes limitations in function that would affect her ability to work.

The Court notes in the first place that, as cited above, "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §405(g).  "A decision is supported by substantial evidence where a reasonable mind could find that the evidence is adequate to support the conclusion reached. . . even if the court might have arrived at a different conclusion."  *Valley v. Comm'r*, 427 F.3d 388, 391 (6th Cir. 2005), citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971) and *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

---

[3]  The ALJ's opinion demonstrates no basis for Plaintiff's contention that in it she "ridiculed Plaintiff's testimony regarding her blood sugar problems".  (Doc. 19 at 3.)

[4]  The Court observes that the ALJ's opinion specifically refuted Plaintiff's "testimony that her diabetes mellitus has been uncontrolled since 2004" (R. 821) by citing to portions of the record after 2004 which stated that Plaintiff's diabetes was under control.

23

The ALJ cited to seven entries in Plaintiff's record of treatment with Angela Rutan, spanning the period from September 26, 2005 until August 2, 2007, which indicated that her diabetes was stable or improved.[5]  In her reply memorandum, Plaintiff cited to several other records, spanning the period from August 23, 2004 until June 23, 2008, which indicated that her diabetes was worse or uncontrolled. (Doc. 19 at 2.)  The evidence in the record is, as Plaintiff states, "mixed in nature", and much exists to support a decision opposite that reached by the ALJ here. However, an underlying ALJ decision is reviewed only for substantial evidence and compliance with relevant legal standards.  To say that "[s]ome records certainly show that her diabetes is under control" but that the record is mixed is essentially to say that, although substantial evidence exists to support the ALJ's findings, the claimant wants the Court to arrive at a different conclusion.  This it is barred from doing.  *Mullen*, *supra*.  Adequate evidence exists to support the ALJ's conclusion that Plaintiff's diabetes was substantially under control to the extent that it was not a severe impairment under Social Security regulations, and, under the standard of review the Court must apply, the Commissioner's findings were therefore conclusive.  Finally, the Court does not find that the ALJ selectively cited to the record to support her conclusions, but rather that her decision was based upon the record as a whole.

Conclusions.  Accordingly, for the reasons set forth above, I **RECOMMEND**

---

[5]  September 26, 2005; March 20, 2006; April 24, 2006; June 2, 2006; December 12, 2006; April 24, 2007; August 2, 2007.  (R. 21.)

that the decision of the Commisioner of Social Security denying benefits be

**SUSTAINED**, and that this case further be **DISMISSED**.

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties a motion for reconsideration by the Court, specifically designating this Report and Recommendation, and the party thereof in question, as well as the basis for objection thereto.  28 U.S.C. §636(b)(1)(B); Rule 72(b), Fed. R. Civ. P.

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *Thomas v. Arn*, 474 U.S. 140, 150-52 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also, Small v. Secretary of Health and Human Services*, 892 F.3d 15, 16 (2d Cir. 1989).

s/Mark R. Abel
United States Magistrate Judge